Present: All the Justices

EDWARD HALE, ET AL.

v. Record No. 081000

BOARD OF ZONING APPEALS FOR
THE TOWN OF BLACKSBURG, ET AL.

                                        OPINION BY
                            JUSTICE LAWRENCE L. KOONTZ, JR.
                                    February 27, 2009

TOWN OF BLACKSBURG, ET AL.

v. Record No. 081001

BOARD OF ZONING APPEALS FOR
THE TOWN OF BLACKSBURG, ET AL.

            FROM THE CIRCUIT COURT OF MONTGOMERY COUNTY
                        Robert M.D. Turk, Judge

    In these consolidated appeals, the principal issue we

consider is whether the circuit court correctly applied Code

§ 15.2-2307 in finding that the owner/developers of a parcel

of real property obtained a vested right to a particular use

of the property under a rezoning ordinance subject to their

proffers and, thus, are not subject to a subsequent amendment

to the locality's zoning ordinance that placed a limitation on

that use. We also consider whether Code § 15.2-2298(B) would

bar the locality from enforcing the amendment of the zoning

ordinance against the property.

                            BACKGROUND

    The material facts are not in dispute. Under familiar

principles, those facts will be stated in the light most

favorable to the appellees, the prevailing parties in the circuit court. Patton v. City of Galax, 269 Va. 219, 222, 609 S.E.2d 41, 42 (2005); Matthews v. Board of Zoning Appeals, 218 Va. 270, 282, 237 S.E.2d 128, 135 (1977).

In 2005, Llamas, LLC obtained controlling rights in a 39.63-acre parcel of real property located in the Town of Blacksburg.[1] The majority of the property was within a "Low-Density Residential District," which is primarily limited to single family detached dwellings and does not permit any use for retail sales. See Blacksburg Zoning Ordinance §§ 3040, 3041.

In January 2006, the developers applied to the Town to rezone 26.63 acres of the property as a General Commercial District, which at the time included "Retail Sales" as a use by right without limitation to the gross floor space of a

---

[1] Llamas, LLC subsequently entered into agreements for the development and purchase of the property with Diversified Investors XIII, LLC, Fairmont Properties, LLC, and Fairmont University Realty Trust, LLC, and these entities joined with Llamas, LLC in responding as the real parties-in-interest to the writs of certiorari to the Board of Zoning Appeals of the Town of Blacksburg in the circuit court. We will refer to these parties collectively as "the developers" throughout this opinion.

2

single structure devoted to that use.[2]  Blacksburg Zoning Ordinance § 3151.  Following the initial application for rezoning, the developers met with neighboring landowners to discuss their concerns about the proposed use of the property. The developers also met and negotiated with the Town's planning staff, the Blacksburg Planning Commission, and the Blacksburg Town Council to reach a mutually satisfactory understanding of the nature of the proposed project to develop the property.  Ultimately, the developers and the Town reached an agreement concerning certain development proffers placing conditions and restrictions on the use of the property once its zoning classification had been changed.  See Code § 15.2-2298(A); Blacksburg Zoning Ordinance § 1160 (both authorizing written proffers of reasonable conditions included in rezoning ordinances).

As relevant to the issues raised in this appeal, the proffers were expressly set out in an amendment to the original rezoning application dated May 3, 2006.  The amended

_____

[2] The rezoning ordinance ultimately adopted by the Blacksburg Town Council in response to the developers' application uses the term "Conditional General Commercial" to describe the new classification for the property.  While the Town of Blacksburg Zoning Ordinance does not define a "conditional general commercial" zoning district, the term "Conditional" as used in the rezoning ordinance refers to the use limitations in proffers made by the developers and adopted as part of the ordinance as permitted by Code § 15.2-2298.

3

application incorporated by reference an original set of proffers dated February 27, 2006 and several revisions thereto. The proffers included increases in certain setback requirements above what would normally be required in the General Commercial District, the requirement to construct perimeter fences and landscape buffers in certain areas, the construction of a multi-use path though the property that would connect with a system of other greenways in the Town, limitations on vehicular traffic, and the placement of private drives or private roads. The only restriction on building size within the proffers was a limitation of building height in certain areas.

The proffers also restricted the permissible uses of the property by excluding certain types of businesses that would otherwise be permitted as a matter of right in a General Commercial District. The proffers went on to describe the project, which at that time was designated as "University Towne Center," as having a "'Traditional Neighborhood' design" and that its "[r]etail and commercial structures" would adhere to this design by varying the appearance of such structures in one or more of their architectural features at least every sixty feet. In keeping with this design concept, large-scale parking lots were to be divided into four or more sections by

4

landscaping and buildings.  The proffers further described the

entire project as

> an exciting "main-street" retail destination that
> invites neighbors and guests to enjoy a host of
> offerings such as specialty shops, unique dining
> establishments, and entertainment – all within a
> short stroll.  The architecture shall resemble the
> vernacular of Blacksburg with casual elegance and a
> pedestrian-friendly, tree-lined boulevard.

Similarly, the developers' vision statement in the

rezoning application described the project as

> a mixed use town center with commercial,
> residential, office, retail, hotel, entertainment,
> public, and cultural facilities interconnected with
> open spaces in a cohesive development that provides
> a distinctive appearance and true sense of space.
> Pedestrian-scale storefronts, small-scale shopping,
> walkways, manicured landscaping, and open public
> areas compliment one another to create a social
> atmosphere.  The development of the property
> adjacent to residential neighborhoods will be
> sensitive to the character and concerns therein.

A conceptual plan submitted with the rezoning application

also described the project as a mixed use retail, commercial,

and residential development.  A "preferred illustrative plan"

showed the project as consisting of buildings of varying size

surrounded by small parking areas with islands for landscaping

and lighting.  At the northern end of the project, which

bordered on Country Club Drive and was designated in the

proffers as the "Country Club Proffer Section," the plan

showed one moderate-sized building and four smaller buildings

surrounded by divided, landscaped parking areas.

5

The proffers also described how "shops with colorful windowscapes will line the development's 'main street' and unique residentual dwellings can be nestled above." The residential aspects of the project were addressed in specific proffers that limited the residential density of the Country Club Proffer Section to 400 total bedrooms and permitted no more than 48 bedrooms per acre should that section of the property be subdivided. Another illustrative design concept showed how mixed use buildings within the project would include retail stores, restaurants, or other commercial uses on the ground floor, with residential condominiums and townhomes on the upper floors.[3]

As previously indicated, at the time the rezoning application was submitted, the General Commercial District included "Retail Sales" as a permitted use without conditions. Blacksburg Zoning Ordinance § 3151. Although the zoning ordinance did not provide for any limitation of gross floor space in a commercial building in the district, no structure in the conceptual plan submitted with the rezoning application

_____

[3] The General Commercial District includes the conditional right to construct multi-family dwellings, Blacksburg Zoning Ordinance § 3151, but the proffers did not expressly provide for a waiver of the condition. The proffers also limited the residential density on the remaining portion of the property to the south of the Country Club Proffer Section, which was designated as the "Kennedy Proffer Section."

exceeded 80,000 square feet of gross floor space for a single retail sales use.

In a staff report prepared by Steve M. Hundley, the Town's Zoning Administrator, it was noted that "the plan in the application is for illustration only."  Thus, Hundley opined that, other than as limited by express proffers, rezoning the property "would allow any use that is permitted in the G[eneral] C[ommercial] [D]istrict."

On May 9, 2006, the Blacksburg Town Council approved the developers' application to rezone the property from low-density residential use to general commercial use.  Blacksburg Town Ordinance § 1412 (hereinafter, "the May 9, 2006 rezoning ordinance").  Typical of such large-scale projects, the developers then began a process of submitting interim plans to the Town's zoning office to receive guidance on whether added details and changes to the conceptual plan comported with the proffers and other zoning requirements.

On January 11, 2007, a "preliminary site plan," designating the project as "South Main Blacksburg" and purporting to show the "proposed merchandising plan," was included as an attachment in a letter to Hundley from an attorney representing the developers.  Although the subject of the communication was limited to a specific proffer concerning restriction of vehicular traffic and a proposed carport

7

structure within the project, the site plan depicted a significant change to the proposed construction on the Country Club Proffer Section. Where previously there had been multiple mixed use structures of moderate size surrounded and separated by small, divided parking areas, the plan now depicted a single large structure, divided into four roughly equal spaces with an open area to the west of the structure. The depicted entrance to the main spaces of the structure faced away from the adjoining public road to the north, while to the south the front of the structure abutted a large parking lot with approximately a dozen small landscaping islands. Neither the total size of the structure nor its intended use were indicated in the materials submitted with the letter, but several "detail drawings" which were included in the site plan indicated that one or more of the sections of the structure would contain at least 30,000 square feet of gross floor space.

On January 22, 2007, Hundley replied to the January 10, 2007 letter. In addition to addressing the specific issue raised concerning vehicular traffic, Hundley also noted several other aspects of the plan that "do[] not comply with several of the other proffers." However, the response did not address the changes in the proposed layout of the Country Club Proffer Section.

8

On January 26, 2007, Rick Howard, the project manager for the developers, submitted a slightly different version of the South Main Blacksburg site plan to Hundley for "a preliminary review." In a letter dated February 9, 2007, Hundley again noted several deficiencies with respect to the plan and expressly reminded Howard that the proffers and conceptual plan "are part of the final amended Rezoning Application" as approved by the Town.

On February 23, 2007, Howard submitted to Hundley a revised site plan for the project, now designated as "Boulevards at Blacksburg," requesting that he "review the current site plan to determine if the proposed layout is in conformance with the Town of Blacksburg Ordinances governing the site." In accompanying materials, the single large structure on the Country Club Proffer Section was described as containing 176,000 square feet of gross floor space. Although the site plan still appeared to divide this structure into four principal sections, in the accompanying materials it was treated as a single unit designated as being exclusively for "retail." The large parking lot adjoining the structure remained unchanged in size and design, except that the plan depicted additional landscaping islands.

In a letter dated March 6, 2007, Hundley again advised Howard of several deficiencies in the proposed site plan

including the failure of some landscaping islands to conform to the minimum dimensions required by the proffer, an overall deficit in the number of the landscaping islands, and an imbalance in the distribution of the parking spaces relative to the structures the parking lots were intended to serve. Although Hundley opined that, other than the items mentioned, the "site plan appears to comply with all proffer[ed] site development requirements," the letter made no direct reference to the changes in the number and size of the structures to be built on the Country Club Proffer Section.

On March 27, 2007, in response to concerns expressed by citizens that the developers intended to construct a "big box" retail store[4] on the Country Club Proffer Section, the Town Council adopted a resolution directing the Town's Planning Commission to "fast track" consideration of changes to the zoning ordinance to restrict the size of retail sales structures in a General Commercial District. On April 10, 2007, the Town Council considered a proposed amendment that would create a new category of "Retail Sales, Large Format" in a General Commercial District that would require a special use

---

[4] The term "big box" generally "refers to free standing warehouse-retail chains, such as Wal-Mart, Target, and Home Depot, that offer a variety of services." Hartley v. Dillard's, Inc., 310 F.3d 1054, 1058 n.2 (8th Cir. 2002); see

permit approved by the Town Council.  The amendment defined a

Retail Sales, Large Format use as

> [r]etail sales uses, including those uses classified
> more specifically by these use type classifications,
> located in one structure in excess of 80,000 square
> feet gross floor area, whether on a single lot or
> contiguous lots owned or operated as associated,
> integrated, or cooperative business enterprises.

On May 1, 2007, at a meeting of the Planning Commission,

Brandol Harvey, the Town's Planning Director, opined that the

developers would not obtain any vested rights for use of the

property until a final site plan for the project had been

approved.  On May 4, 2007, the developers sent to the Town's

Zoning Office for approval a final site plan for "First &

Main: Phase 2," which covered the Country Club Proffer Section

of the project.[5]  The developers contended that the Town was

required to approve or deny the plan within fifteen working

days of its submission, and the plan submittal receipt gave

---

also Commonwealth Transp. Comm'r v. Target Corp., 274 Va. 341,
345, 650 S.E.2d 92, 94 (2007).
    [5] The developers also submitted for approval a final site
plan for "First & Main: Phase 1," which was the Kennedy
Proffer Section.  A traffic impact study and a transportation
improvement plan, covering both parts of the project, were
also submitted for approval.  Although the record is not clear
as to the date of these submissions, the record numbers
assigned to them by the Town suggest that they were filed at
the same time as the two site plans.

the "Date . . . Due Out" as May 25, 2007.[6]  However, the Zoning

Administrator made a notation on the receipt that the Town had

"up to 60 days" to review the plans.

On May 10, 2007, the developers filed a complaint in the

Circuit Court of Montgomery County against the Town, the Town

Council, and Hundley in his capacity as Zoning Administrator.

The developers alleged that Hundley was deliberately delaying

the process of approving the site plan in order to permit the

Town Council to vote on the proposed amendment creating the

Retail Sales, Large Format special use classification for the

General Commercial District.  They also advanced several legal

theories in support of their assertion that they already had a

vested right to build a retail sales structure in excess of

80,000 square feet of gross floor space on the property.  The

developers sought a declaratory order to that effect, an

_____

[6] Code § 15.2-2307 provides, in part, that one method for
obtaining a vested right to use of a property is if "the
governing body or its designated agent has approved a
preliminary . . . site plan or plan of development for the
landowner's property and the applicant diligently pursues
approval of the final . . . plan within a reasonable period of
time under the circumstances."  The developers conceded that
the submission of a supposed final site plan, despite not yet
having received approval of any of the preliminary plans
submitted, and their insistence that it be approved or
rejected within fifteen working days was an attempt to assure
that they would obtain a vested right to construct a retail
sales structure in excess of 80,000 square feet of gross floor
space.

injunction prohibiting the Town from interfering with the right, and a writ of mandamus directing Hundley to complete the review of the submitted site plan within fifteen working days of its submission.[7]

On May 25, 2007, Hundley and James E. Henegar, Jr., the Blacksburg Town Engineer, advised the developers by letter that the traffic impact study and the transportation improvement plan for the project were not approved, citing multiple areas in which the submissions were deficient. They further advised the developers that the review of the site plans for "Phase 1" and "Phase 2" was continuing.

On May 29, 2007, the Town Council approved Blacksburg Town Ordinance § 1450 adopting the proposed amendment to the zoning ordinance (hereinafter, "the May 29, 2007 amendment") creating the special use category of Retail Sales, Large Format in the General Commercial District. In a letter dated June 18, 2007, Hundley advised the developers that, based on the site plan of First & Main: Phase 2 submitted for approval

---

[7] Although the circuit court subsequently ruled that the developers had not exhausted their available administrative remedies and, thus, the controversy alleged in the May 10, 2007 complaint was not yet ripe for a declaratory determination or award of injunctive relief, the court did not dismiss the complaint and it remains pending on the circuit court's docket. However, the issues raised therein have, for all intents and purposes, been subsumed within the subsequent proceedings that led to these appeals.

on May 4, 2007, he had "preformed [a] vested rights determination concerning the effect of the new special use permit for large format retail sales uses on [the developers'] project." In an attached determination memorandum, Hundley reviewed the history of the May 9, 2006 rezoning ordinance and then addressed each of the contentions made in the May 10, 2007 complaint for declaratory and injunctive relief asserting that the right to construct a retail sales structure without limitation to its size had already vested as a result of the proffers made in obtaining the rezoning. Rejecting each of the developers' contentions, Hundley concluded that the developers had not acquired a vested right to the unrestricted retail sales use permitted in the General Commercial District prior to the May 29, 2007 amendment of the zoning ordinance. Thus, Hundley concluded that "the subject property is subject to the provisions of Ordinance 1450." The Blacksburg Town Attorney co-signed the determination of rights memorandum, concurring as to the conclusions of law therein. In both the determination of rights memorandum and in the cover letter, Hundley advised the developers that the determination could be appealed to the Board of Zoning Appeals for the Town of Blacksburg ("BZA").

In subsequent letters dated June 27, 2007 for First & Main: Phase 1 and June 29, 2007 for First and Main: Phase 2,

14

Hundley advised the developers that the approval of the site plans submitted on May 4, 2007 had been denied. In each denial letter, Hundley listed numerous deficiencies in the site plans. With respect to Phase 2, the Country Club Proffer Section, Hundley specifically noted that the proposed structure constituted a Retail Sales, Large Format use and would require a special use permit. Hundley further concluded that the elimination of a mixed use, multi-building design for that section of the project violated the provision of the proffers requiring the project to follow a "Traditional Neighborhood Design." Specifically, Hundley noted that the proffers required the design to have a "discernable center" consisting of a landscaped plaza, square, traffic circle, outdoor restaurant or similar pedestrian area, and further required that that parking areas to be divided into four or more landscaped sections.

By letter dated July 3, 2007, the developers advised Hundley and the BZA of their intent to appeal Hundley's determination that they did not have a vested right to an unrestricted retail sales use of the property. The developers asserted that Hundley "erred in finding that [the developers do] not have vested rights under Va. Code § 15.2-2298(B) and 15.2-2307." Specifically, they contended that Hundley had erred in finding that there had been no "significant

15

affirmative governmental act" as that term is used in Code 15.2-2307, in finding that the Town "has not accepted proffers or proffered conditions which specify use related to the zoning amendment" as required by the statute, and in finding that the proffers failed to "specify a use for which the subject property would be developed."

On July 25, 2007 and July 31, 2007, the BZA conducted public hearings on the developers' appeal of Hundley's determination that there was no vested right to a retail sales use of the property under the rezoning ordinance as conditioned by their proffers which would permit the developers to build a large format retail sales structure without first obtaining a special use permit. There was a high level of public participation at the meetings, with sentiment running strongly against permitting a "big box" retail store to be built on the property. At the conclusion of the July 31, 2007 meeting, however, the BZA voted unanimously to overturn the Zoning Administrator's determination and ruled that the developers had a vested right to the retail sales use permitted in a General Commercial District consistent with the Retail Sales use classification of Blacksburg Zoning Ordinance § 3151 as in effect prior to the May 29, 2007 amendment that limited such structures to no

more than 80,000 square feet of gross floor space unless a special use permit was obtained.

On August 27, 2007, the Town, the Town Council, the Town's Department of Planning and Engineering, and Hundley, acting in his capacity as Zoning Administrator, (collectively, "the Town"), jointly filed a petition for a writ of certiorari in the Circuit Court of Montgomery County seeking a review of the BZA's decision. On August 30, 2007, Edward Hale, as lead plaintiff, and twenty other residents of Blacksburg (collectively, "the residents") filed a separate petition for a writ of certiorari in the circuit court also seeking a review of the BZA's decision. The residents alleged that all the plaintiffs "own property located adjacent to or in close proximity to the property subject to the [BZA's] [d]ecision."[8] Both petitions made substantially the same allegations of facts and asserted concordant theories of errors of law they maintained the BZA had made in awarding the developers a vested right to an unrestricted retail sales use of the property. The circuit court entered an order consolidating

---

[8] The developers challenged the legal standing of Hale and the other residents to seek certiorari. On January 23, 2008, the circuit court entered an order finding that the residents had standing, and the developers do not challenge that aspect of the court's judgment in this appeal.

17

the two petitions, and the cases were thereafter tried together.

On September 27, 2007, the developers filed a response to the residents' petition.[9]  Therein, they contended that the BZA had properly determined that all the requirements of Code § 15.2-2307, including that the proffers accepted by a locality as a condition of rezoning should "specify use," had been met.  The developers contended that the statute did not require the proffers to expressly nominate any specific use in order for the landowner to obtain vested rights.  Rather, they contended that so long as the proffers did not place limitations on otherwise permissible uses, the landowner became vested with the right to all such uses provided that the other requirements of the statute were met.  Because the proffers had prohibited certain uses otherwise permissible in a General Commercial District and also placed additional restrictions on other uses of the property, such as the increased setbacks and limitations on building height, the developers contended that they had acquired a vested right to the retail sales use permitted in the General Commercial

---

[9] The developers did not file a response to the Town's petition prior to consolidation of the cases.

District prior to the May 29, 2007 amendment of the zoning ordinance.

The developers further contended that Code § 15.2-2298(B) also supported the BZA's decision overturning the Zoning Administrator's determination.  They contended that one of the proffers required the developers to create a multi-use path through the project as part of the Town's pedestrian and bicycle greenways.  Conceding that this proffer did not require the developers to deed the path to the Town, they nonetheless contended that the requirement that the path be integrated into the greenway system satisfied the requirement of the statute that the landowner would dedicate "real property of substantial value" for public use that was not "generated solely by th[e] [re]zoning itself."  They further noted that another proffer required the developers to pay $25,000 toward the cost of improvements to a street intersection that was not directly adjacent to the project, which they contended constituted a "substantial cash payment[] for . . . substantial public improvements" under the statute. Asserting that, under such circumstances, Code § 15.2-2298(B) provides that any subsequent amendment to the zoning ordinance which eliminates or materially reduces or modifies the permitted uses in the zoning district is not applicable to the property, the developers contended the Town was barred from

19

enforcing the May 29, 2007 amendment of the zoning ordinance with respect to the property.

On December 10, 2007, the Town filed a memorandum responding to the contentions made by the developers in their response to the residents' petition. The Town asserted that Code § 15.2-2307 did not provide for the vesting of a right to the retail sales use of the property because the developers' proffers did not expressly specify that such use would be made of the property expect as part of a mixed use, traditional neighborhood design. The fact that the proffers prohibited certain uses and placed general restrictions on others was not sufficient to establish a right to all other uses permissible in the General Commercial District at the time of the rezoning. The Town further asserted that the proffers did not require the developers to dedicate any property or make "substantial" payments to Town and, thus, Code § 15.2-2298(B) did not bar the Town from enforcing the May 29, 2007 amendment of the zoning ordinance requiring the developers to obtain a special use permit for any large scale retail use of the property. The residents also filed a hearing memorandum raising substantially the same assertions as the Town.

On December 19, 2007, the circuit court conducted a hearing on the consolidated petitions for writs of certiorari. The parties reiterated their positions with respect to the

application of Code §§ 15.2-2307 and 15.2-2298(B), but otherwise did not raise any additional issues relevant to these appeals.

On January 24, 2008, the circuit court issued an opinion letter in which it limited its analysis of the issues to the application of Code § 15.2-2307.  Relying on this Court's decision in City of Suffolk v. Board of Zoning Appeals, 266 Va. 137, 580 S.E.2d 796 (2003), the court found that the May 9, 2006 rezoning ordinance and the incorporated developers' proffers constituted a "significant affirmative governmental act" under the statute, that the developers "were pursuing the development of this property in reliance on the [rezoning] ordinance," and that the proffers had adequately identified the specific tract of land and the specific project subject to the proffers.

The circuit court expressly rejected the contention of the Town and the residents that because the proffers did not specify retail sales as a separate, intended use of the property, the developers could not obtain a vested right to that use.  Rather, the court agreed with the developers that the proffers were sufficient to satisfy the requirement of the statute that they "specify use."  The court specifically noted that the proffers "limit certain uses of the property that would normally be allowed under the general commercial zoning

21

for the Town [and] limit[] the residential density of the proposed project and further provide[] for safeguards such as buffering zones, etc. throughout the course of the project to protect the surrounding residential areas."

Accordingly, the circuit court ruled that the BZA did not err in overturning Hundley's determination that the developers did not have a vested right to use the property for retail sales in accord with the General Commercial District classification as in effect prior to the May 29, 2007 amendment of the zoning ordinance. On February 25, 2008, the court entered a final order affirming the decision of the BZA, incorporating by reference the findings of fact and conclusions of law in the January 24, 2008 opinion letter. Both the Town and the residents noted their objections to the order and each filed notices of appeal from the court's judgment.

By orders dated September 10, 2008, we awarded appeals to both the Town and the residents, consolidating those appeals for argument and decision. By an order dated November 12, 2008, we permitted the Local Government Attorneys of Virginia, Inc., The Virginia Association of Counties, and the Virginia Municipal League to appear on brief as amici curiae in support of the Town.

DISCUSSION

The review of a decision of a board of zoning appeals upon a petition for a writ of certiorari filed in a circuit court is governed by Code § 15.2-2314.  Prior to July 1, 2006, the statute, as interpreted by decisions of this Court, provided that the board's findings of fact and conclusions of law were both vested with a presumption of correctness and, thus "the appealing party [had] the burden of showing that the board applied erroneous principles of law or that its decision was plainly wrong and in violation of the purpose and intent of the zoning ordinance."  City of Suffolk, 266 Va. at 142, 580 S.E.2d at 798.  Similarly, "[a] circuit court decision affirming a board of zoning appeals determination [was] also accorded this presumption of correctness on appeal to this Court."  Id. at 142-43, 580 S.E.2d at 798 (citing Natrella v. Board of Zoning Appeals, 231 Va. 451, 456, 345 S.E.2d 295, 299 (1986)).

However, under an amendment to Code § 15.2-2314 effective on July 1, 2006 only "the findings and conclusions of the board of zoning appeals on questions of fact shall be presumed to be correct," and "[t]he [circuit] court shall hear any arguments on questions of law de novo."  2006 Acts ch. 446 (emphasis added); see Board of Supervisors of Loudoun County v. Town of Purcellville, 276 Va. 419, 439, 666 S.E.2 512,

23

521-22 (2008); see also Goyonaga v. Board of Zoning Appeals, 275 Va. 232, 241 n.3, 657 S.E.2d 153, 158 n.3 (2008); Trustees of the Christ and St. Luke's Episcopal Church v. Board of Zoning Appeals, 273 Va. 375, 380 n.3, 641 S.E.2d 104, 106 n.3 (2007). We have since held that, as a result of the 2006 amendment of Code § 15.2-2314, the judgment of a circuit court in such cases is no longer presumed to be correct on appeal and "its conclusions of law are reviewed de novo." Lovelace v. Orange County Board of Zoning Appeals, 276 Va. 155, 158, 661 S.E.2d 831, 832 (2008).

The Town and the residents each raise a single assignment of error in their respective appeals. In substance, they assert that the circuit court erred in determining under the facts of this particular case that the adoption of the May 9, 2006 rezoning ordinance constituted a significant affirmative governmental act allowing development of a specific project within the meaning of Code § 15.2-2307.

The developers respond that the circuit court properly found that the proffers they agreed to in this case satisfy the requirements of the statute so as to afford them the vested right that they claimed. Alternately, the developers contend that even if the requirements of Code § 15.2-2307 were not met, they are nonetheless entitled to assert the application of Code § 15.2-2298(B) because the proffers

24

include the requirement to expend funds for and devote part of their property to public use, thus entitling them to be free of the effect of any subsequent amendment of the classification to which their property was rezoned.

Replying to the developers' assertion of the application of Code § 15.2-2298(B), the Town and the residents contend that the requirement in the proffers that the developers construct a multi-use path on the property is not a "requirement for the dedication of real property of substantial value, or substantial cash payments for or construction of substantial public improvements, the need for which is not generated solely by the rezoning itself." Id. Thus, they maintain that Code § 15.2-2298(B) does not bar the Town from enforcing the change in the permissible uses in the General Commercial District that requires a special use permit for Retail Sales, Large Format structures.

The interpretation of Code §§ 15.2-2307 and 15.2-2298(B), as well as their application to the proffers incorporated in the May 9, 2006 rezoning ordinance, are questions of law and, accordingly, the judgment of the circuit court in this case is subject to a de novo review by this Court. Lovelace, 276 Va. at 158, 661 S.E.2d at 832. Moreover, under settled principles of statutory construction, we are bound by the plain meaning of the statutory language. Hicks v. Mellis, 275 Va. 213, 218,

25

657 S.E.2d 142, 144 (2008); <u>Young v. Commonwealth</u>, 273 Va.
528, 533, 643 S.E.2d 491, 493 (2007); <u>Alliance to Save the
Mattaponi v. Commonwealth</u>, 270 Va. 423, 439, 621 S.E.2d 78,
86-87 (2005). Applying these principles to the issues raised
in these appeals, we will address the vested rights issue
under Code § 15.2-2307 first, since it was the basis of the
circuit court's judgment.

All the parties, including the amici, rely heavily in
their briefs upon this Court's opinion in <u>City of Suffolk</u>,
each contending that the rationale of the decision in that
case supports their respective views of the application of
Code § 15.2-2307 to the facts of this case. We note, however,
that the resolution of the issue in that case did not depend
on whether the City had "accepted proffers or proffered
conditions which specify use related to a zoning amendment."
Code § 15.2-2307 (second paragraph). Indeed, no discussion of
that aspect of the statute appears in the majority opinion,
and the specific language is quoted by the dissent only in
passing. <u>City of Suffolk</u>, 266 Va. at 150, 580 S.E.2d at 802
(Keenan, J., dissenting). And, while the facts of that case
did deal with rezoning proffers that included limitations on
residential density as in this case, the appellants in <u>City of
Suffolk</u> did not contest that "such a rezoning meets the new
criteria in subsection (ii) of the second paragraph of Code

26

§ 15.2-2307 whereby 'rezoning for a specific use or density' is 'deemed to be a significant affirmative governmental act'" that would give rise to a vested right to the specified use subject to those limitations. Id. at 144, 580 S.E.2d at 799.

Rather, the issue in City of Suffolk was whether the landowner had sufficiently identified the "specific project" to which the proffers for rezoning applied and had diligently pursued the development of that project after obtaining the rezoning. Id. Accordingly, while aspects of the discussion in City of Suffolk are instructive for interpreting Code § 15.2-2307, the decision in that case is not dispositive of the issue raised in this appeal with respect to that statute.[10]

The tension that exists between the right of a landowner to make use of his property to his advantage and the necessity that local governments be permitted to restrict the use of land within their borders in order to assure orderly and

_____

[10] It should further be noted that City of Suffolk, in which we affirmed a judgment of the circuit court upholding a decision of a board of zoning appeals, was decided under the former version of Code § 15.2-2314 and, thus, the decisions of the board and the circuit court were entitled to a presumption of correctness as to the conclusions of law upon which they were based. City of Suffolk, 266 Va. at 142-43, 580 S.E.2d at 798. Accordingly, even if we were to find that the decision in City of Suffolk was directly applicable to this case, we would nonetheless be required to revisit the issues addressed therein in order to apply a de novo standard to the circuit court's application of Code § 15.2-2307 as required by Code § 15.2-2314 as amended.

27

beneficial growth and redevelopment has resulted in the General Assembly, beginning in the early twentieth century, creating a statutory framework for zoning and development which places responsibilities on both landowners and localities.  See E. A. Prichard & Gregory A. Riegle, Searching For Certainty: Virginia's Evolutionary Approach To Vested Rights, 7 Geo. Mason L. Rev. 983, 983 and n.4 (1999).  It is well established in the law that as to an existing use, absent condemnation and payment of just compensation, the landowner has the right to continue that use even after a change in the applicable zoning classification causes the use to become nonconforming.  See, e.g., Board of Supervisors of Fairfax County v. Board of Zoning Appeals, 271 Va. 336, 348, 626 S.E.2d 374, 381 (2006).  In contrast, when a landowner has only a future expectation that he will be allowed to develop his property in accord with its current classification under the local zoning ordinance, there is "no vested property right in the continuation of the land's existing zoning status." Board of Zoning Appeals v. Caselin Systems, Inc., 256 Va. 206, 210, 501 S.E.2d 397, 400 (1998); see also Patton, 269 Va. at 225, 609 S.E.2d at 44.

" 'However, in limited circumstances, private landowners may acquire a vested right in planned uses of their land that may not be prohibited or reduced by subsequent zoning

28

legislation.' " City of Suffolk, 266 Va. at 143, 580 S.E.2d

798 (quoting Caselin Systems, 256 Va. at 210, 501 S.E.2d at

400). Code § 15.2-2307 defines some of the "limited

circumstances" under which a landowner will acquire a vested

right to a future use of his property.

    As relevant to this appeal, Code § 15.2-2307 provides:

    Without limiting the time when rights might
    otherwise vest, a landowner's rights shall be deemed
    vested in a land use and such vesting shall not be
    affected by a subsequent amendment to a zoning
    ordinance when the landowner (i) obtains or is the
    beneficiary of a significant affirmative
    governmental act which remains in effect allowing
    development of a specific project, (ii) relies in
    good faith on the significant affirmative
    governmental act, and (iii) incurs extensive
    obligations or substantial expenses in diligent
    pursuit of the specific project in reliance on the
    significant affirmative governmental act.

(Emphasis added.)

    "Code § 15.2-2307 provides for the vesting of a right to

a permissible use of property against any future attempt to

make the use impermissible by amendment of the zoning

ordinance." Goyonaga, 275 Va. at 244, 657 S.E.2d at 158, 160

(emphasis omitted). However, " '[t]he mere reliance on a

particular zoning classification, whether created by ordinance

or variance, creates no vested right in the property owner.' "

City of Suffolk, 266 Va. at 145, 580 S.E.2d at 799 (quoting

Snow v. Amherst County Board of Zoning Appeals, 248 Va. 404,

408, 448 S.E.2d 606, 608-09 (1994)). Rather, the three

29

specific conditions of the statute's first paragraph – that the landowner has been the beneficiary of a significant affirmative governmental act allowing development of a specific project, that the landowner relied upon that governmental act in good faith, and that the landowner has incurred extensive obligations or substantial expenses in pursuit of the specific project – must each be met before the right to maintain a permissible use in the future will be deemed to have vested.

Code § 15.2-2307 lists six actions that a local governing body may take, either directly or by a surrogate, which constitute significant affirmative governmental acts allowing development of a specific project.  While the statute further provides that the list is not exhaustive, the parties agree that only the first two of the denoted actions would be potentially applicable to the facts of this case:

> (i) the governing body has accepted proffers or proffered conditions which specify use related to a zoning amendment; (ii) the governing body has approved an application for a rezoning for a specific use or density; . . . .

Code § 15.2-2307 (emphasis added).

With respect to the first significant affirmative governmental act denoted in Code § 15.2-2307 and identified above, the Town and the residents concede that the Town "accepted proffers or proffered conditions . . . related to

[the May 9, 2006] [re]zoning amendment," but they contend that for a landowner to acquire a vested right in a particular use, the proffers must expressly reference that use. In their view, the proffers made by the developers in this case do not adequately specify the intended "retail sales" use of the property so as to entitle the developers to a vested right to that use free from the subsequent adoption of the May 29, 2007 amendment of the zoning ordinance requiring a special use permit for a retail sales use that would exceed 80,000 square feet of gross floor space.

The developers contend that it is not necessary that the proffers expressly include a reference to a particular permissible use in order for a landowner to obtain a vested right to that use. Rather, they contend that so long as at least one of the accepted proffers touches on the use of the land in any fashion, an unrestricted vested right can accrue as to any permissible use of the land not expressly excluded or limited by the proffers as a whole. In this case, they note that the proffers accepted by the Town expressly excluded eight of the permissible uses in the General Commercial District. The proffers also made restrictions on all other uses, at least in certain areas of the property, with respect to building height and increased setbacks, and also specified other requirements for use of the property such as placement

31

of roads, buffer zones, and the construction of the multi-use path.  Contending that these aspects of the proffers "specify use," the developers assert that prior to the May 29, 2007 amendment of the zoning ordinance creating the Retail Sales, Large Format special use classification, by their good faith reliance on the May 9, 2006 rezoning ordinance and incurring obligations and expenses to advance the project, they acquired a vested right to develop the property under the previously unrestricted retail sales classification of the General Commercial District.  We disagree.

In 1978, the General Assembly formally authorized certain local governments to accept voluntary proffers made by landowners requesting special consideration from the locality to allow a particular use of property.  See 1978 Acts ch. 320 (enacting former Code §§ 15.1-491.1 and 15.1-491.2, subsequently incorporated into current Code §§ 15.2-2296 and 15.2-2297).  Proffers are voluntary commitments made by landowners in order to facilitate approval of conditional zoning and rezoning requests by ameliorating the impact of development of their property on the local infrastructure and the character and environment of adjoining land.  See Prichard & Riegle, 7 Geo. Mason L. Rev. at 988.  In Virginia, proffers, once accepted, have the force of law equal to the requirements

32

of the zoning ordinance.  Id.; see Code §§ 15.2-2297(A) and 15.2-2303(A).

Code § 15.2-2307 provides that a significant affirmative governmental act includes a circumstance when "the governing body has accepted proffers or proffered conditions which specify use related to a zoning amendment."  (Emphasis added.) The plain meaning of this language is that the proffers must affirmatively identify the use for which a vested right is sought.  Accordingly, we cannot agree with the developers that when a particular proffer merely prohibits certain uses that would otherwise be permitted under the zoning classification that is sought by the application, by implication the proffers as a whole are deemed to "specify" all other permissible uses as being the subsumed within the meaning of the landowner's proffers.

Because development proffers, once accepted, have the force of law that will bind both the local government and the current and future owner of the property to their terms, the terms of the proffers must be interpreted according to the plain meaning of the language used.  Just as a court is not permitted to go beyond the words of a statute to infer a meaning that is not found in its express language, see, e.g., Tazewell County School Board. v. Brown, 267 Va. 150, 161-62, 591 S.E.2d 671, 676-77 (2004), we will not infer a meaning in

33

development proffers that is not found through a plain reading of the text. Clearly then a development proffer cannot be said to "specify use" in accord with the requirements of Code § 15.2-2307 by a negative inference arising from the absence of a prohibition of the use within the proffer. Accordingly, we reject the developers' contention that the prohibition of eight specific uses by the proffers in this case constitutes a specific reservation of a right to all other uses permissible in the General Commercial District.

Similarly, we reject the developers' contention that terms of development proffers that apply to any use of the property, such as increased setbacks, restrictions on building height, or the required inclusion of specific support improvements such as roads and landscaping, "specify use" of the property in order to create a vested right to any particular permissible use of the property so long as the landowner adheres to those restrictions and conditions. The developers concede that the conceptual plans and the description of the project in the rezoning application and the proffers were intended to provide for "flexibility" in the ultimate development of the property. However, as was observed during oral argument of these appeals, flexibility is the opposite of specificity, and specificity is what Code § 15.2-2307 requires for a landowner to obtain a vested right

34

through a locality's acceptance of development proffers in the context of adoption of a rezoning ordinance.  In short, when vested rights accrue to a landowner as the result of a significant affirmative governmental act, the rights that vest are only those that the government affirmatively acts upon, and the evidence to support the claim to those rights must be clear, express, and unambiguous.

We have reviewed the final proffers that were accepted by the Town and incorporated into the May 9, 2006 rezoning ordinance.  Although the project was clearly intended to include retail business establishments within its mixed use design, nothing in the proffers would have given the Town notice that the Country Club Proffer Section would be devoted exclusively to the unrestricted retail sales use permitted in the General Commercial District at the time of the rezoning. There is simply no language in the proffers and nothing in the attendant materials that were submitted with the rezoning application that would "specify use" so that it could be found the developers clearly intended to reserve, or the Town intended to be bound to, a vested right for an unrestricted retail sales use of the property.

The developers contend, however, that even if they were required to "specify use" with particularity in order to claim a vested right to use the property for unrestricted retail

35

sales and the proffers failed to adequately do so, they nonetheless were the beneficiaries of a significant affirmative governmental act under clause (ii) of the second paragraph of Code § 15.2-2307 in that by accepting the proffers when adopting the May 9, 2006 rezoning ordinance, the Town "approved an application for a rezoning for a specific . . . density."  Because both the Kennedy and Country Club Proffer Sections had express limitations on the maximum residential density that would be permitted thereon, the developers contend that these proffers satisfy this definition of a significant affirmative governmental act, entitling them to a vested right to any permissible use of the property under the General Commercial District.

In support of this contention, the developers assert that "there is nothing 'illogical' about having a residential density limitation vest a landowner's rights to use land for commercial purposes."  Rather, they contend that "it would be unfair for the locality to accept the diminished residential density proffers but then downzone the remaining commercial uses that had induced the owner to agree to the residential-density reduction."  We disagree.

Nothing in the record supports the developers' contention that they were "induced" to proffer the limitations on residential density in expectation of receiving vested rights

36

to unrestricted development of all commercial uses of the property. To the contrary, it is clear that the inclusion of residential density limitations was part of the overall scheme of the project to create a balanced, mixed use community. Accordingly, even if we were to assume as the developers contend that a voluntary proffer of a restriction on one type of use could be made as an inducement to assure that the landowner received a vested right to another type of use, this simply did not occur in this case.

Moreover, we do not agree with the broader premise that a landowner who is the beneficiary of a significant affirmative governmental act as the result of a proffer limiting density on a specific category of use is thereby entitled to claim a vested right to every use of the land that was permissible at the time of the act without regard to whether the proffer restricting density related to the use for which the right is asserted. There is no doubt that when a locality approves a request to rezone property based on a proffer that includes a limitation on the density of a particular use that is less than would normally be permitted under the new classification, this would constitute a significant affirmative governmental act. However, the only vested right that clearly would accrue to the landowner in that circumstance would be the right to use the property for the specific use and up to the density

that the particular proffer specified.  The locality would unlawfully interfere with such a right only if it were to attempt to enforce a subsequent change in the zoning classification that eliminated or restricted the ability to use the property consistent with the proffer limiting the density of the specified use.  The May 29, 2007 amendment to the General Commercial District classification did not impair the ability of the developers in this case to use their property consistent with the proffered limitations on residential density thereon.

For these reasons, we hold that the developers were not the beneficiaries of a significant affirmative governmental act based on acceptance of proffers that specified retail sales as the particular use for which they subsequently sought to establish a vested right, nor did the Town's acceptance of the limitation on residential density as part of the proffers provide the developers with a vested right to non-residential uses of the property, including unrestricted retail sales. Accordingly, we hold the circuit court erred in affirming the decision of the BZA that afforded the developers a vested right to the retail sales use of the property free from the restriction of the May 29, 2007 amendment of the zoning

ordinance requiring a special use permit for large format

retail sales structures.[11]

The developers contend, however, that Code § 15.2-2298

bars the Town from enforcing the May 29, 2007 amendment of the

zoning ordinance against the property, and the judgment of the

circuit court can be affirmed on that basis.  The relevant

portion of that statute provides:

> B. In the event proffered conditions include a
> requirement for the dedication of real property of
> substantial value, or substantial cash payments for
> or construction of substantial public improvements,
> the need for which is not generated solely by the
> rezoning itself, then no amendment to the zoning map
> for the property subject to such conditions, nor the
> conditions themselves, nor any amendments to the
> text of the zoning ordinance with respect to the
> zoning district applicable thereto initiated by the
> governing body, which eliminate, or materially
> restrict, reduce, or modify the uses, the floor area
> ratio, or the density of use permitted in the zoning
> district applicable to the property, shall be
> effective with respect to the property unless there
> has been mistake, fraud, or a change in
> circumstances substantially affecting the public
> health, safety, or welfare.

The developers contend that the proffers require them to

make "donations of real property and cash to the Town."

According to the developers, these "donations" consist of the

---

[11] In light of our resolution of the Code § 15.2-2307
issue on these grounds, we need not consider the further
contention raised by the Town and the residents that the
rezoning application did not adequately identify the "specific
project" which was the subject of a significant affirmative
governmental act.

39

creation of the multi-use path that is to connect to the Town's greenway system and a payment of $25,000 for improvement of a street intersection "that is not on, or adjacent, to the [p]roperty." They contend that they will expend substantial sums to create the multi-use path and that neither the need for construction of the path nor the cash payment for the improvement of the intersection was "generated solely by the rezoning itself."

The Town and the residents respond that the requirement for the developers to create the multi-use path does not fall within the intendment of Code § 15.2-2298(B) because the proffer does not require the land used for the path to be dedicated to the Town. They note that the developers will retain both ownership of and the right to control access to the path. They further contend that even if the $25,000 payment for the improvement of the street intersection is not adequately related to the purpose of the rezoning, a $25,000 payment as part of a project valued at over $45,000,000 does not constitute a "substantial cash payment[] for . . . substantial public improvements" under Code § 15.2-2298(B).

We agree with the Town and the residents that the requirement in the proffer that the developers create the multi-use path through the project to connect to the Town's greenway system is not a "requirement for the dedication of

40

real property of substantial value." The developers attempt to characterize this provision as a "donation" of the property is simply not supported by the record. The developers will continue to own the property over which the path runs, they will control the design of the path over their property, and they will be responsible for its maintenance. Accordingly, we hold that the requirement in the proffer that the developers create a multi-use path on the property does not constitute a "dedication of real property" within the meaning of Code § 15.2-2298(B).

Similarly, we do not agree that the required contribution to the cost of the street intersection improvement would trigger Code § 15.2-2298(B)'s prohibition of enforcing any subsequent amendment to the zoning classification against the property. Even if we were to assume that the required cash payment of $25,000 constituted a "substantial cash payment[] for . . . substantial public improvements," id., we find that the record does not support the developers' contention that need for the improvement of the intersection is not related to the rezoning.

The intersection in question lies just to the north of the developers' property. The proffer requiring the cash payment describes the improvement to the intersection as the construction of "a roundabout or other traffic calming measure

to improve traffic flow at this location." The necessity to the developers' intended project of having improved traffic flow at a nearby major intersection is self-evident, and the amount of the required contribution to those improvements is well within any reasonable estimate of the added cost which would result from the increased burden on the intersection arising from the developers' project. Accordingly, we hold that the need for the developers to contribute to the cost of the improvement of the intersection arose as a result of the developers' request to rezone the property and, thus, does not implicate the provisions of Code § 15.2-2298(B).

CONCLUSION

For these reasons, we hold that the circuit court erred in ruling that the BZA correctly determined that the developers had a vested right to develop on the property structures for retail sales in excess of 80,000 square feet of gross floor space without the necessity of first obtaining a special use permit. Accordingly, we will reverse the judgment of the circuit court affirming the decision of the BZA, reinstate the determination of the Zoning Administrator that a special use permit will be required for a Retail Sales, Large Format use of the property, and enter final judgment here for the Town and the residents.

Record No. 081000 – Reversed and final judgment.

42

Record No. 081001 – <u>Reversed and final judgment</u>.