COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Judges Ortiz, Raphael and Senior Judge Annunziata
Argued at Fairfax, Virginia


CHRISTINE CHEN ZINNER, ET AL.

v.      Record No. 1941-23-4

WASHINGTON GAS LIGHT COMPANY                     OPINION BY
                                                 JUDGE STUART A. RAPHAEL
WASHINGTON GAS LIGHT COMPANY                     JULY 1, 2025

v.      Record No. 1962-23-4

CHRISTINE CHEN ZINNER, ET AL.


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
David A. Oblon, Judge

Isak Howell (Evan Dimond Johns; Isak Howell Law Office;
Appalachian Mountain Advocates, on briefs), for Christine Chen
Zinner, Kurt Iselt, Sarah Ellis, and Lillian Whitesell.

Jeremy C. Marwell (Ronald J. Tenpas; Nathan Campbell; Alden L.
Atkins; Shane M. Murphy; Laura Golden Liff; Vinson & Elkins
LLP; Law Office of Alden L. Atkins, PLLC; Miles & Stockbridge,
P.C., on briefs), for Washington Gas Light Company.

Marc E. Gori, Assistant County Attorney (Elizabeth D. Teare,
County Attorney; T. David Stoner, Deputy County Attorney;
F. Hayden Codding, Assistant County Attorney; Office of the Fairfax
County Attorney, on brief), for Board of Supervisors of Fairfax
County, Virginia.

(Martin R. Crim; Sands Anderson PC, on brief), for Board of Zoning
Appeals of Fairfax County, Virginia.  Board of Zoning Appeals of
Fairfax County, Virginia submitting on brief.

The question in these consolidated appeals is whether the Washington Gas Light

Company may install a 24-inch-diameter high-pressure natural-gas pipeline under a road passing

through the Pimmit Hills neighborhood in Fairfax County without a special exception from the

Board of Supervisors. The pipeline will be constructed in a Virginia Department of Transportation ("VDOT") right-of-way. After the zoning administrator concluded that the pipeline was part of an ordinary distribution system for which the zoning ordinance did not require a special exception, four Pimmit Hills residents (the "landowners") appealed to the Board of Zoning Appeals ("BZA"). The BZA agreed with the landowners that the pipeline was a transmission line that required a special exception. On Washington Gas's petition for a writ of certiorari, the circuit court reversed. The court found that Washington Gas's entire pipeline system is for the distribution of natural gas to consumers, so it is exempted by the zoning ordinance from the special-exception requirement.

On appeal to this Court, the landowners claim that the circuit court erred by failing to give deference to the BZA's interpretation of the zoning ordinance. Washington Gas counters that the BZA erred in its interpretation and that the landowners lacked standing to appeal to the BZA in the first place. The company also challenges the circuit court's decision to dismiss as moot the company's separate action that sought to invalidate the BZA's interpretation on the ground that it conflicted with the Dillon Rule and with certain Virginia statutes.

We conclude that at least one of the landowners has standing to maintain this action, but we reject the landowners' arguments on the merits. The landowners correctly argue that the circuit court's ruling was overbroad to the extent it exempted from the special-exception requirement *any* pipeline that Washington Gas may seek to build. But we affirm the circuit court's judgment that the project at issue is a "distribution" line exempt from that requirement. We agree with the circuit court that de novo review was required of the BZA's legal construction of the zoning ordinance, so the court was not required to give any deference or great weight to the BZA's construction. We also affirm the circuit court's order dismissing Washington Gas's

declaratory-judgment action as moot. In short, we affirm the circuit court's judgment in all respects, except that we limit our ruling to the particular project at issue here.

BACKGROUND

Washington Gas is a "local distribution company," *see* 20 VAC 5-312-10, that sells natural gas to consumers rather than to other companies for resale. It maintains more than 14,000 miles of distribution mains, 519 miles of high-pressure distribution mains, and 174 miles of federally regulated transmission mains. The latter two categories are the "backbone" of Washington Gas's system, "arteries" needed to move gas around its service area and into lower-pressure distribution lines.

The project at issue here is Washington Gas's "Strip 1" replacement. Washington Gas installed the original Strip 1 in 1948, running from its Dranesville gate station eastward down Route 7. The project to replace Strip 1 was broken into "west" and "east" portions. The eastern portion relevant here aims to replace five miles of pipeline, re-routing the path away from Route 7 to avoid congestion in the Tysons Corner area.

A federal regulation, 49 C.F.R. § 192.3 (2023), promulgated by the Pipeline and Hazardous Materials Safety Administration ("PHMSA"), a division of the Department of Transportation ("DOT"), regulates "transmission" pipelines. The new Strip 1 will be "downstream" of a transmission main and will not be subject to the PHMSA regulation. The Strip 1 east project is made up of 6 phases. The specific portion at issue here is Phase 6, which will run through the Pimmit Hills neighborhood under Pimmit Drive.

The landowners asked the Fairfax County zoning administrator to determine whether the zoning ordinance would require a special exception from the Board of Supervisors to authorize

Phase 6.[1]  The zoning administrator found that Phase 6 was exempt from the usual special-exception requirements.  Interpreting Fairfax County's new "zMod" zoning ordinance,[2] she decided that Phase 6 was most like a "light utility use" because it "is or is related to the distribution of utility products."  It was thus exempt from the special-exception requirement because (1) it would be an "ordinary distribution facilit[y] for delivery of utilities to customers that [is] in a public right-of-way," FCZO § 4102.4.X(3)(a); and (2) it would be "located in a street right-of-way . . . for the distribution to consumers of . . . gas," FCZO § 9103.4.E.  The landowners appealed the zoning administrator's ruling to the BZA.

At the BZA hearing, the landowners asserted that the zoning ordinance distinguished between distribution and transmission pipelines and that Phase 6 would be the latter.  As a transmission pipeline, they argued, Phase 6 would be subject to the special-exception requirement.  They also argued that the ordinance distinguishes "ordinary distribution" from other distribution uses.  For its part, Washington Gas contended that Phase 6 is not a transmission line but a distribution line exempted from the special-exception requirement by the

---

[1] *See generally* Code § 15.2-2286(A)(3) ("[T]he governing body of any locality may reserve unto itself the right to issue such special exceptions."); Fairfax Cnty. Zoning Ordinance ("FCZO") §§ 8103.1, 8103.2.A(6) (describing "legislative" powers of the Board of Supervisors to issue "special exceptions" on recommendation from the Planning Commission); *Newberry Station Homeowners Ass'n v. Bd. of Supervisors*, 285 Va. 604, 620 (2013) ("Approval of a special exception is a legislative act."); *KSS One, LLC v. Henrico Cnty.*, 76 Va. App. 770, 779-82 (2023) (distinguishing legislative actions by the governing body in zoning matters from ministerial approvals carried out by the governing body's agents).

[2] Fairfax County enacted the original zMod ordinance in 2021, shortly before the zoning administrator's determination.  But in March 2023, the Supreme Court declared the zMod ordinance void ab initio.  *See Berry v. Bd. of Supervisors*, 302 Va. 114, 147 (2023).  The circuit-court hearing in these cases began in April 2023, but the court stayed further proceedings in response to *Berry*.  The Board of Supervisors readopted zMod on May 9, 2023.  When the hearing below resumed, all parties agreed that the readopted zMod ordinance was the relevant ordinance.  Because no party contends otherwise, we assume that the new zMod ordinance supplies the rule of decision here.

two provisions governing light utility uses cited above. The company also argued that the BZA should dismiss the appeal because the landowners lacked standing.

During the BZA hearing, each of the four landowners described their various concerns about Phase 6, which included risks associated with a high-pressure pipeline and the increased cost in the future to replace sewer laterals that would have to be rerouted around it. The landowners' lawyer also noted their concerns about the denial of "ingress and egress" to their properties during construction. He said that when "there is a giant pit in front of your driveway, . . . you can't take your car out of your driveway or move it back in."

On the merits, the landowners argued that the exemption to the special-exception requirement applied only to lines that transport gas directly to consumers, not pipelines that transport gas between Washington Gas facilities. Washington Gas countered that it had never been required to obtain special-exception approval for any of its pipelines in a VDOT right-of-way.

By a six-to-one vote, the BZA reversed the zoning administrator's decision, adopting the "findings of fact and conclusions of law" proposed by BZA Vice-Chairman James Hart. The BZA found that the landowners had standing, noting that "three of the four [landowners] are very close [to the pipeline]. One isn't that far away and one of the four is right on the street." The landowners had also shown particularized harm, especially Lillian Whitesell, "whose lot is right on the street there with the excavation immediately in front of her house . . . . [T]here would at least be some temporary interference with her access in and out of the lot."

On the merits, however, the BZA disagreed with the zoning administrator that a special exception was not required for Phase 6. As Vice-Chairman Hart explained in the approved motion, some pipelines were subject to the special-exception requirement. Phase 6 would be one

of those subject pipelines because it was for transmission of gas "from point A to point B," not distribution to "individual houses. There's not laterals connecting to the houses."

Washington Gas sought review of the BZA's decision under Code § 15.2-2314 by petition for writ of certiorari to the circuit court. The company also filed a separate suit seeking a declaratory judgment that the zMod ordinance, as applied to Phase 6, was preempted by State law. Washington Gas's second amended complaint for declaratory judgment is the operative pleading at issue here. The circuit court granted the writ of certiorari[3] and consolidated the two cases.

In prehearing briefing, Washington Gas asserted that the zMod ordinance incorporated the federal definition to differentiate between natural-gas "transmission" lines that required a special exception from "distribution" lines that did not:

> zMod defines "transmission pipeline" as "defined in the Code of Federal Regulations," which in turn defines a transmission line as a pipeline that: (1) "[t]ransports gas from a gathering pipeline or storage facility to a distribution center, storage facility, or large volume customer that is not downstream from a distribution center"; (2) "[h]as an MAOP [Maximum Operating Pressure] of 20 percent or more of SMYS [Specified Minimum Yield Strength]"; (3) "[t]ransports gas within a storage field", or (4) "[i]s voluntarily designated by the operator as a transmission pipeline." zMOD § 9102; 49 C.F.R. § 192.3.

Washington Gas argued that the BZA's failure to apply that standard "was legal error." It said it would show at the upcoming hearing "that the Phase 6 pipeline meets none of the federal regulatory requirements incorporated by zMOD."

At the hearing that followed, Washington Gas acknowledged that at least one landowner lived close to the project. But it argued that there was no particularized harm sufficient to confer

---

[3] Code § 15.2-2314 provides, "Upon the presentation of such petition, the court *shall allow* a writ of certiorari to review the decision of the board of zoning appeals." (Emphasis added).

standing, reasoning that generalized fear of a gas explosion was too speculative and that any construction-related impacts would be carefully managed. The parties disputed the standard of review. Washington Gas argued that the BZA's legal conclusions should be reviewed de novo; the landowners argued that the court should give "great weight" to the BZA's administrative interpretation.

Washington Gas presented several witnesses. The first was Aaron Stuber, the company's senior director of asset management, responsible for classifying the company's lines as distribution or transmission lines. Stuber testified that Washington Gas classified its pipelines according to the governing federal regulation, 49 C.F.R. § 192.3. He addressed each of the four subparts in that regulation, explaining that the planned Phase 6 line would not qualify as a transmission line under any of them. Stuber also noted that if the landowners' definition of "distribution line" were accepted, it would require reclassifying 519 miles of its high-pressure distribution lines as transmission lines.

As for the claimed traffic impacts, Stuber said that steps would be taken to minimize disruption to Pimmit Drive. Each crew would install a 40-foot segment of pipe along the VDOT right-of-way; the work on each segment would take about a week to complete. One lane of Pimmit Drive would be closed during the workday. The construction trench would be six feet deep and two feet wide. Stuber said that the trench would be covered in the evening with metal plates, allowing vehicles to drive over it safely.

The zoning administrator testified that, to her knowledge, Fairfax County had never required special-exception approval for any of Washington Gas's pipelines installed in a VDOT right-of-way. She cited two letters from prior zoning administrators in support of her position that Phase 6 would be exempt. The landowners disputed her interpretation of the letters.

- 7 -

Washington Gas also called Richard Huriaux, an expert in the natural-gas industry and pipeline regulation. He testified that Washington Gas is a local distribution company involved exclusively in the distribution or sale of natural gas. He said that all natural-gas pipelines fall into one of three categories: gathering, transmission, or distribution. Phase 6 is not a gathering pipeline, as it is not connected to a wellhead area where natural gas is produced. The remaining categories are mutually exclusive: a pipeline is either a transmission line or a distribution line. Like Stuber, Huriaux explained that Phase 6 would not qualify as a "transmission line" under any of the four prongs of the PHMSA definition in 49 C.F.R. § 192.3.

The landowners presented Greg Abbott, an expert in the field of utility regulation. He testified that Phase 6 should be classified as a transmission line because it contains gas that is too pressurized to directly serve customers. He said that Washington Gas had presented testimony to the State Corporation Commission ("SCC") describing Phase 6 as a transmission line. He acknowledged, however, that the SCC does not rely on the federal definition of a transmission line but looks only to the pipeline's function. On cross-examination, Abbott was confronted with other definitions under which Phase 6 would be considered part of a distribution system.

Next, Whitesell testified that she lived on Pimmit Drive, directly on the Phase 6 route. She discussed several harms she expected from the Phase 6 project, including issues with having her children walk to school on the sidewalks, getting her car in and out of her driveway, and increased traffic, noise, dust, and debris. She was also concerned about the increased difficulty and cost she would experience when the time came to replace her sewer lateral, which would have to be rerouted around the high-pressure pipeline. Washington Gas disputed Whitesell's assertions, claiming that she was overstating the possible impacts and that having to park on the street for some time during construction would not be onerous.

Finally, Kurt Iselt explained the project's effects on him. He lived on Griffith Road, near Pimmit Drive and close enough to see the Phase 6 route from his front yard. He said that he was concerned about dirt and dust, driveway access, traffic delays, limited bus transportation, limited sidewalk access, and noise during construction. He also discussed the issue of sewer-lateral replacements, explaining that all homeowners in Pimmit Hills were responsible for replacing their own sewer laterals when needed and that the old age of the homes increased the probability of such repairs. As in its cross-examination of Whitesell, Washington Gas suggested that Iselt was overstating the harms. Iselt responded that a plumber had told him that a sewer-lateral replacement would cost twice as much to install because of the proximity to a high-pressure natural-gas pipeline. He acknowledged that he did not have a "specific timeline" to replace his sewer lateral but said it was "a ticking clock."

In its closing argument, Washington Gas again argued that Phase 6 was not a transmission line under the federal definition. The company said that "the only standard provided by zMod is the PHMSA standard. This is in Section 9102 [of the zMod ordinance,] where it defines transmission pipeline." Washington Gas cited Huriaux and Stuber's testimony that Phase 6 "doesn't fit" the PHMSA standard.

The circuit court affirmed the BZA's finding that the landowners had standing, reversed its determination that Phase 6 was a transmission line requiring a special exception, and dismissed Washington Gas's declaratory-judgment action as moot. The court issued a lengthy opinion setting forth its findings. *See Washington Gas Light Co. v. Zinner*, 113 Va. Cir. 630 (Fairfax 2023). Beginning with the standard of review, the court noted that Code § 15.2-2314, as amended in 2006, required that the BZA's ordinance interpretations be reviewed de novo, without deference to its legal conclusions. *Id.* at 637. The BZA's findings of fact were entitled

to a presumption of correctness, although that presumption could be overcome by a preponderance of the evidence. *Id.*

The court found that the landowners satisfied the two-pronged test for standing set forth in *Friends of the Rappahannock v. Caroline County Board of Supervisors*, 286 Va. 38, 48 (2013). *See Washington Gas*, 113 Va. Cir. at 638-39. Under *Friends*, the complainant must own or occupy property "in close proximity" to the subject property and must demonstrate "injury or potential injury not shared by the general public." 286 Va. at 48-49. As to proximity, Whitesell's property directly abutted the proposed pipeline. *Washington Gas*, 113 Va. Cir. at 638. The court credited the BZA's finding of proximity for the other landowners. *Id.* The court further found that the landowners suffered particularized harm from the increased future cost to replace sewer laterals. *Id.* at 639. While the court also found that the landowners would suffer temporary harms during construction, particularly Whitesell, the court declined to decide as a matter of law whether such temporary impacts sufficed to confer standing. *Id.* at 639 & n.14.

On the merits, the court concluded that a special exception was not required because Phase 6 qualified under the zMod ordinance as a "distribution" pipeline. *Id.* at 643-49. The court ruled that Washington Gas's "entire system" was "a distribution system" and that Phase 6 was an exempted "component part" of that system. *Id.* at 646. The court did not rely on the definition of "Transmission Pipeline" in § 9102 of the zMod ordinance—which incorporated the federal definition of "Transmission line" from 49 C.F.R. § 192.3. The court reasoned that that definition did not control whether Phase 6 was a transmission or distribution line for purposes of §§ 4102.4.X(3) and 9103.4.E. *Id.* at 647. Still, the court said that *if* the federal definition applied, Phase 6 would not be a transmission line. *Id.* at 647-48.

Finally, the court dismissed Washington Gas's declaratory-judgment action as moot. *Id.* at 650. The court reasoned that, since Washington Gas had prevailed in showing that Phase 6

was not a transmission line requiring special-exception approval, its request for a declaratory judgment to vacate the BZA's ruling was "no longer live." *Id.* The court added that "unless and until [Washington Gas's] Phase 6 pipeline is subject to regulation under the Zoning Ordinance, the issue of whether the Zoning Ordinance would be preempted is not ripe for adjudication." *Id.*

The landowners and Washington Gas each appealed from the circuit court's final order, and we consolidated the appeals for briefing and oral argument.

ANALYSIS

*A. At least one landowner has standing.*

Standing addresses "the characteristics of the person or entity who files suit. The point of standing is to ensure that the person who asserts a position has a substantial legal right to do so and that his rights will be affected by the disposition of the case." *Anders Larsen Tr. v. Bd. of Supervisors*, 301 Va. 116, 120 (2022) (quoting *Cupp v. Bd. of Supervisors*, 227 Va. 580, 589 (1984)). "The pivotal question is 'whether [t]he [complaining party] has a sufficient interest in the subject matter of the case so that the parties will be actual adversaries and the issues will be fully and faithfully developed.'" *Id.* at 121 (alterations in original) (quoting *Cupp*, 227 Va. at 589).

"Where a party appeals to the circuit court from a decision of the Board of Zoning Appeals, we employ a two-prong test to determine whether a person who does not have an ownership interest in the subject property has standing to challenge a zoning determination."[4] *Id.*

> First, the complainant must own or occupy real property within or in close proximity to the property that is the subject of the land use determination, thus establishing that it has a direct, immediate, pecuniary, and substantial interest in the decision.

---

[4] Because the landowners have established standing under the *Friends* standard, we do not reach their claim that appeals from the zoning administrator to the BZA should be reviewed using a less-demanding standard.

- 11 -

> Second, the complainant must allege facts demonstrating a particularized harm to some personal or property right, legal or equitable, or imposition of a burden or obligation upon the petitioner different from that suffered by the public generally.

*Id.* (quoting *Friends*, 286 Va. at 48). "Complainants do not need to establish that the particularized harm has already occurred." *Id.* (quoting *Friends*, 286 Va. at 49).

Once one complainant demonstrates standing for the relief requested, a court need not determine whether the other complainants have standing. *See Blanton v. Amelia Cnty.*, 261 Va. 55, 59 n.* (2001) ("[S]ince it is clear from the record that [some] plaintiffs . . . have standing to challenge the County's ordinances, we need not determine whether the remaining plaintiffs have the requisite standing."); *accord Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 674 n.6 (2020) ("Under our precedents, at least one party must demonstrate Article III standing for each claim for relief.").

"We review de novo the question of whether the appellants' factual allegations were sufficient to establish standing, as this issue presents a question of law." *Anders Larsen*, 301 Va. at 122 (quoting *Platt v. Griffith*, 299 Va. 690, 692 (2021)). Still, in determining whether the facts in the record establish the landowner's standing, we "accord[] a presumption of correctness to the circuit court's factual findings." *Prince William Bd. of Cnty. Supervisors v. Archie*, 296 Va. 1, 9 (2018) (quoting *W&W P'ship v. Prince William Cnty. Bd. of Zoning Appeals*, 279 Va. 483, 486 (2010)).

The circuit court's factual findings here support both the proximity and particularized-harm requirements for standing. Whitesell lives directly on Pimmit Drive where Phase 6 will be installed, and Washington Gas concedes that her location is close enough. Washington Gas Br. 47. Moreover, taking the facts in the light most favorable to the landowners, we agree that Whitesell showed particularized harm that is different from the harm to the public at large. The BZA found that Whitesell would suffer injury because her "lot is right

- 12 -

on the street . . . with the excavation immediately in front of her house," causing "at least . . . some temporary interference with her access in and out of the lot."  As BZA Vice-Chairman Hart put it, "if that kind of situation where somebody is immediately adjacent to an excavation in a street in front of their house[,] if they don't have standing to object to the structure or the excavation . . . , then nobody does."

Applying Code § 15.2-2314, the circuit court said that it "must presume [the BZA's] fact-finding to be correct."  Although the court declined to decide as a matter of law whether "temporary construction-related harms support standing," it found that the facts adduced at the hearing supported the BZA's factual finding that, at times, "Whitesell will be unable to access her property by car."

That finding is amply supported by the record.  The engineering drawings show the pipeline and construction trench passing immediately in front of Whitesell's driveway on Pimmit Drive.  As Whitesell put it, the construction will happen "not more than a few feet from my mailbox, which is right on the sidewalk."  The trench will be six feet deep and two feet wide. Although metal plates will cover the trench in the evening, allowing vehicles to pass over it, the trench will be open during the workday.  Whitesell testified that she does a "hybrid of telework and work in the office," requiring that she be able to drive out of her driveway for business meetings or site visits at various times during the day—morning, midday, and early afternoon. Because each 40-foot segment will take up to a week to complete, Whitesell will be unable to drive in or out of her driveway during the workday for up to a week while the pipeline segment is laid in front of her property.

Although Washington Gas argues that such impacts will be mitigated by the restrictions in its VDOT permit and that Whitesell's loss of driveway access is too temporary to confer standing, we are not persuaded.  Even when a construction permit can successfully mitigate most

- 13 -

construction impacts, it does not necessarily mitigate all impacts. *See Seymour v. Roanoke Cnty. Bd. of Supervisors*, 301 Va. 156, 169 (2022) (finding standing where, "[a]lthough the Board of Supervisors imposed several conditions on the special use permit at issue in this case, these conditions did not address the alleged harm created by the traffic on the easement"). Despite Washington Gas's best efforts, Whitesell will still suffer up to a week's worth of lost driveway access during the workday.[5]

We disagree with Washington Gas that such temporary harms do not confer standing. To be sure, most of our foundational standing cases have involved allegations of permanent harm or injury. But the test for standing is whether the injury is "a particularized harm to 'some personal or property right, legal or equitable, or *imposition of a burden or obligation upon the petitioner different from that suffered by the public generally*.'" *Friends*, 286 Va. at 48 (emphasis added) (quoting *Va. Marine Res. Comm'n v. Clark*, 281 Va. 679, 687 (2011)). Losing access to one's driveway during the workday for up to a week qualifies as a burden particular to Whitesell that is "different from that suffered by the public generally." *Id.* (quoting *Clark*, 281 Va. at 687). Whitesell's injury, though temporary, gives her "a sufficient interest in the subject matter of the case so that the parties will be actual adversaries and the issues will be fully and faithfully developed." *Cupp*, 227 Va. at 589. And because Whitesell has standing, we need not consider whether the other landowners also have standing.[6] *Blanton*, 261 Va. at 59 n.\*.

---

[5] The circuit court said in a footnote that "[t]here will be times—*perhaps only minutes long*—when Landowner Whitesell will be unable to access her property by car as Washington Gas contractors dig up the road in front of her driveway." *Washington Gas*, 113 Va. Cir. at 639 n.14 (emphasis added). As confirmed at oral argument, however, the record does not support the circuit court's "only minutes long" inference, as the trench will be open during the *workday* for the period when contractors dig the trench and lay the pipe in front of Whitesell's driveway.

[6] We likewise do not reach the circuit court's ruling that the landowners have standing because they will have to pay more when the time comes to replace their sewer laterals. *See Theologis v. Weiler*, 76 Va. App. 596, 603 (2023) ("[W]e look for the best and *fewest* grounds on which to resolve this appeal.").

*B. Phase 6 is part of an ordinary distribution line that does not require a special exception.*

The landowners complain that the circuit court wrongly rejected the BZA's ruling that Phase 6 is a transmission line that requires a special exception under the zMod ordinance. Washington Gas counters that the circuit court correctly declared all its lines in Fairfax County part of its distribution system.

In an appeal that involves the interpretation of a zoning ordinance, "the findings and conclusions of the board of zoning appeals on questions of fact shall be presumed to be correct. The appealing party may rebut that presumption by proving by a preponderance of the evidence . . . that the board of zoning appeals erred in its decision." Code § 15.2-2314. But "[t]he court shall hear any arguments on questions of law de novo." *Id.*[7]

We start from common ground: no party disputes the conclusions of the zoning administrator, the BZA, and the circuit court that Phase 6 is a "light utility use" under the zMod ordinance. The ordinance distinguishes between "heavy utilities, which are infrastructure services that provide regional or community-wide service, and light utilities, which are infrastructure services that need to be located in or near where the service is provided." FCZO § 9103.4.E. A "heavy" utility facility is "[a] major component of an infrastructure system. Examples of heavy utility facilities include potable water treatment plants, wastewater treatment plants, solid waste facilities, gas compressor stations, and electricity generating plants and facilities, other than solar power facilities." *Id.* By contrast, a "light" utility facility is "[a] structure or facility generally related to the distribution or collection of utility products or services, rather than the production of those products or services, that needs to be in or near the neighborhood or near utility consumers." *Id.* Examples "include water and sewage pump

---

[7] Part C below explains why we reject the landowners' claim that we must give "great weight" and "deference" to the BZA's legal interpretation of the zoning ordinance.

- 15 -

stations, telephone local exchanges, water storage facilities, and electrical substations including distribution centers and transformer substations." *Id.*

Two provisions in the zMod ordinance exempt from the special-exception requirement certain light-facility-use "distribution" lines. Section 4102.4.X(3)(a) provides that "[i]f located in a street right-of-way . . . the following light facility utility uses and structures are exempt from the Ordinance regulations: . . . pipes . . . for the distribution to customers of . . . gas." Section 9103.4.E exempts "ordinary distribution facilities for delivery of utilities to customers that are in the public right-of-way or in easements or strips of property owned in fee simple not more than 25 feet in width; or (2) transmission lines approved by the State Corporation Commission."[8]

The BZA, however, determined that Phase 6 is a transmission line, not an ordinary distribution line that would be exempt from the special-exception requirement. Because it was unclear whether the BZA's conclusion involved a "question of fact" or "question of law," the circuit court analyzed it both ways. *See Washington Gas*, 113 Va. Cir. at 643-47. We find no reversible error in either branch of that analysis.

If the BZA made a factual finding that Phase 6 is a transmission line, that finding was "presumed to be correct" on appeal to the circuit court. Code § 15.2-2314. Washington Gas then had to "rebut that presumption by proving by a preponderance of the evidence . . . that the board of zoning appeals erred in its decision." *Id.* We agree with the circuit court that Washington Gas shouldered that burden by proving "that the Phase 6 pipe is a distribution pipe. It is not a transmission line." *Washington Gas*, 113 Va. Cir. at 649.

Stuber testified that Washington Gas classifies its pipelines according to the governing federal regulation, 49 C.F.R. § 192.3. The regulation provides:

_____

[8] The zoning administrator testified before the BZA that subpart (ii) is inapplicable here because the SCC did not act to approve the Phase 6 project.

> *Transmission line* means a pipeline or connected series of
> pipelines, other than a gathering line, that:
>
> (1) Transports gas from a gathering pipeline or storage facility to a
> distribution center, storage facility, or large volume customer that
> is not down-stream from a distribution center;
>
> (2) Has an MAOP of 20 percent or more of SMYS;[9]
>
> (3) Transports gas within a storage field; or
>
> (4) Is voluntarily designated by the operator as a transmission
> pipeline.

49 C.F.R. § 192.3.  Stuber then explained that Phase 6 meets none of those four tests.  It is not connected to a gathering line, storage facility, or large-volume customer that is not down-stream from a distribution center.  "It transports gas from a distribution center" at the "city gate station." Washington Gas is a "local distribution company"; it does not resell the gas but provides all of it to its customers, "who use it for consumption."  Washington Gas will not operate the line at pressures that exceed the threshold for designating it a transmission line.  And Washington Gas has not and "will not" voluntarily designate Phase 6 as a transmission line.  Huriaux agreed that Phase 6 is not a transmission line under any of the four prongs of the federal definition.  The landowners do not dispute any of those findings on appeal.[10]

---

[9] *MAOP* "means the maximum pressure at which a pipeline or segment of a pipeline may be operated" under the federal regulation; *SMYS* means the "specified minimum yield strength" specified by the pipe manufacturer (if known) or by the regulation (if the manufacturer is unknown).  49 C.F.R. § 192.3.

[10] Although the landowners' third assignment of error argued that Washington Gas "voluntarily designated" Phase 6 as a transmission line under the fourth prong of the definition in 49 C.F.R. § 192.3, they abandoned that claim in their opening brief.  "Rule 5A:20(e) requires a party to include in [its] brief: 'argument—including principles of law and the authorities,' for each assignment of error." *Conley v. Commonwealth*, 74 Va. App. 658, 681 (2022).  When, as here, "a brief assigns error on one ground, but then fails to specifically argue those grounds in the body of the brief, [we] consider[] the issue waived." *Amazon Logistics, Inc. v. Va. Emp. Comm'n*, ___ Va. ___, ___ (2025) (quoting *AlBritton v. Commonwealth*, 299 Va. 392, 412 (2021)).

For completeness, however, we note that the circuit court rejected the landowners' voluntary-designation theory.  Stuber testified that some company employees, in their internal

Although the circuit court concluded that the "Transmission line" definition in 49 C.F.R. § 192.3 did not control the exemption question under the zMod ordinance, it found "as fact that the Phase 6 pipeline fails to meet" any of the federal criteria for classifying it as a transmission line. *Washington Gas*, 113 Va. Cir. 647-49. The court acknowledged that § 9102 of the zMod ordinance, entitled "General Terms," defines "Transmission Pipeline" as "[a] transmission line that transports gas as defined in the Code of Federal Regulations, Title 49, Sect. 192.3." *Id.* at 647. Both the zMod definition and the federal definition it incorporates use *line* and *pipeline* interchangeably: the zMod definition defines transmission "*Pipeline*" as a transmission "line," FCZO § 9102; and under the federal definition, "*Transmission line* means a pipeline," 49 C.F.R. § 192.3. Still, the circuit court thought that definition inapplicable because the exact phrase "transmission pipeline" is not referenced in the zMod exemptions for distribution lines (FCZO §§ 4102.4.X(3) and 9103.4.E), but only in FCZO § 5100.2.Q(1), which describes "Major Underground Utility Easements." *Washington Gas*, 113 Va. Cir. at 647. Even so, for the sake of "comprehensiveness," the court went through each of the four federal criteria for establishing a "transmission" line and concluded that Phase 6 did not qualify. *Id.* at 647-49. Because we find those factual findings well supported in the record, we treat them as evidence that rebuts the BZA's conclusion that Phase 6 is a transmission line.[11]

Further, we agree with the circuit court that the additional evidence adduced by Washington Gas rebutted the BZA's finding that Phase 6 is a transmission line. Citing Stuber's

communications, refer to lines like Phase 6 as "transmission" lines for "ease of reference," a shorthand for "high-pressure distribution" lines, a "bit of a mouthful." But the company has used the term "distribution" line when referring to Phase 6 in its filings with the SCC and PHMSA. The circuit court credited Stuber's testimony.

[11] We therefore do not reach whether, as a matter of law, the Board of Supervisors intended the "Transmission Pipeline" definition in § 9102 of the zMod ordinance to control whether a line is a distribution or transmission line within the meaning of FCZO §§ 4102.4.X(3) and 9103.4.E.

- 18 -

testimony—which it found "particularly credible"—the circuit court said the following evidence

showed that Phase 6 is a distribution line, not a transmission line:

> Washington Gas only delivers gas to ultimate consumers of gas. It does not resell gas. It does not produce gas. It does not transport gas from a storage facility. Washington Gas obtains the gas it distributes from supplier pipelines at a "city gate." It uses different types of pipes to bring gas to consumers—some are larger, high pressure that do not immediately connect to customers; others are lower pressure and lead up to customer's individual gas meters for their use. Washington Gas classifies its pipelines as "low," "medium," and "high" pressure. Only low-pressure pipelines link to the meters of individual landowners who use gas. However, all three are used for distribution.

*Washington Gas*, 113 Va. Cir. at 646 (record citations omitted). Those factual findings are well

supported by the record and rebut the presumption of correctness of the BZA's factual

determination.[12] So we find no error in the circuit court's finding, contrary to the BZA's, that

Phase 6 is for "the distribution to consumers of . . . gas," FCZO § 4102.4.X(3), and the "delivery

of utilities to customers," FCZO § 9103.4.E.

Is the result any different if the BZA's determination is viewed as a conclusion of law,

reviewed de novo? We think not. We agree with the circuit court that the BZA erred in

---

[12] In an appeal to the circuit court under Code § 15.2-2314, "any party may introduce evidence . . . in accordance with the Rules of Evidence of the Supreme Court of Virginia." Even so, the landowners argue on brief that the circuit court defied its quasi-appellate role by hearing *so* much new evidence that it effectively ruled on a different project from the one considered by the BZA. Their too-much-new-evidence argument is not properly before us, however, because it is not included in any assignment of error. *See* Rule 5A:20(c)(1) ("Only assignments of error listed in the brief will be noticed by this Court."). The landowners attempt to sidestep that problem by including their too-much-new-evidence claim as part of their argument that the circuit court should have deferred to the BZA's interpretation of the zoning ordinance. *See* Part C *infra*. But whether the circuit court should have given deference to the BZA's legal rulings is a different question from whether the court considered too much new evidence. A party may waive an argument "when the argument on brief, even if carefully crafted and legally persuasive, nonetheless has little, if anything, to do with the assignment of error." *Amazon*, ___ Va. at ___ (quoting *AlBritton*, 299 Va. at 412). The landowners have run afoul of that rule here.

construing the zMod exemptions for distribution lines to impose a direct-connection requirement that is not found in the text of the ordinance.

As noted above, Stuber testified that Washington Gas has "three levels of distribution systems[:] . . . the low-pressure system, a medium-pressure system, and a high-pressure system. They're all distribution." Because a direct connection to customers normally requires a low-pressure line, the BZA reasoned that a line with higher pressure, like Phase 6, could not be considered a distribution line. Instead, it was "a transmission line for . . . natural gas at high pressure that goes through the neighborhood. It's not serving the individual houses. There's not laterals connecting to the houses."

The BZA did not cite any legal authority for that requirement. And the idea that a distribution line must be low pressure and connect directly to the customer's home is not found in the text of FCZO §§ 4102.4.X(3)(a) or 9103.4.E. Section 4102.4.X(3) speaks to "the distribution to consumers of . . . gas." Section 9103.4.E refers to the "delivery of utilities to customers." As the circuit court correctly put it, "nothing in the Zoning Ordinance requires a gas pipeline to service the properties it passes to be deemed to perform 'distribution to consumers.' The BZA would amend the ordinance to read 'distribution *directly* to consumers.'" *Washington Gas*, 113 Va. Cir. at 643. Indeed, the BZA's interpretation would effectively reclassify 519 miles of Washington Gas's existing high-pressure distribution lines as transmission lines. Yet as the zoning administrator testified, to her knowledge (dating to 1988), Fairfax County has not required Washington Gas to obtain a special exception to install any gas pipeline in a VDOT right-of-way.

We thus agree with the circuit court that the BZA committed an error of law when it concluded that Phase 6 cannot be a distribution line unless it is a low-pressure line that connects directly to the customers' homes that it passes. While the governing body "may elect to amend

its zoning ordinances, that power is not within the province of the judiciary. Courts cannot add language to an ordinance that the drafters have not seen fit to include." *Patton v. City of Galax*, 269 Va. 219, 233 (2005).

Still, we do not go as far as the circuit court, which found that Washington Gas's "entire system" qualifies as "a distribution system" under the zMod ordinance. *Washington Gas*, 113 Va. Cir. at 646. It was unnecessary for the circuit court to rule so broadly. The "doctrine of judicial restraint requires appellate courts to decide cases 'on the best and narrowest ground available.'" *Rebh v. Cnty. Bd. of Arlington Cnty.*, ___ Va. ___, ___ (2024) (quoting *McGhee v. Commonwealth*, 280 Va. 620, 626 n.4 (2010)). "[C]ourts should think hard, and then hard again, before turning small cases into large ones." *Id.* at ___ (quoting *Camreta v. Greene*, 563 U.S. 692, 707 (2011)). The only pipeline project at issue in this case is Phase 6. Because it is unnecessary to do so, we do not determine whether all the facilities in Washington Gas's "entire system" are or would be distribution lines exempt from special-exception approval.

*C. The circuit court properly declined to defer to the BZA's interpretation.*

The landowners argue that the circuit court erred "by failing to accord appropriate deference" to the BZA's interpretation of the zMod ordinance. Zinner Br. 8. They claim that the BZA's decision was entitled to "great weight," yet the circuit court gave it no weight. *Id.* at 13-14. While acknowledging that "the BZA's interpretation is not binding," they say it "reflects the body's recognized 'expertise in the relationship between particular textual language and a local government's overall zoning plan.'" *Id.* at 15 (quoting *Trs. of the Christ & St. Luke's Episcopal Church v. Bd. of Zoning Appeals*, 273 Va. 375, 382 (2007)). The landowners argue that the BZA's position is also supported by decisions of the zoning administrator in 1988 and 1994.

We are not persuaded. To start, as noted above, the BZA did not explain the legal basis for its conclusion that a pipeline can be a distribution line *only* if it connects directly to a customer's home that it passes. Even if we were legally required to give great weight to the BZA's determination, we would find it unpersuasive and not controlling considering the record in this case.

Moreover, the two zoning-administrator letters from more than 30 years ago undercut the landowners' argument for deference. In each instance, the zoning administrator determined that a Washington Gas line to be installed in a VDOT right-of-way was an ordinary distribution line exempt from the special-exception requirement. The 1988 determination involved a 24-inch pipeline, the same size as Phase 6. Washington Gas had represented that the pipeline did not qualify as a transmission line under the federal definition. And the zoning administrator found in the 1994 determination that Washington Gas had "stipulated that the diameter of the proposed pipeline (12") preclude[d] its inclusion in the Federal definition of a transmission line." Neither determination used the must-connect-directly-to-the-customer test that was invoked here by the BZA (apparently for the first time). As noted above, the zoning administrator testified that, to the best of her knowledge, Fairfax County has not required a special exception for any Washington Gas pipeline in a VDOT right-of-way.

Nor can the landowners' argument for giving weight and deference to the BZA's interpretation be squared with the 2006 amendment to Code § 15.2-2314, which created a "de novo" standard for reviewing the legal conclusions of a board of zoning appeals. 2006 Va. Acts ch. 446 ("The court shall hear any arguments on questions of law de novo."). The landowners argue that the de novo standard is not irreconcilable with giving the BZA's reading great but not dispositive weight. But that claim does not survive scrutiny.

- 22 -

The standard of review in an appeal from a BZA determination has changed considerably over the past 70 years. Earlier versions of Code § 15.2-2314 and its predecessor statutes did not distinguish appeals of zoning-ordinance interpretations from appeals of decisions granting or denying a variance or special exception; the statute also referenced reviewing the "decision" of a board of zoning appeals without distinguishing between the board's findings of fact and its conclusions of law. *See* 1950 Va. Acts ch. 135 (Code § 15-850); Code § 15.1-497 (1964); 1997 Va. Acts ch. 587 at 1177-78 (Code § 15.2-2314). In *Hopkins v. O'Meara*, 197 Va. 202 (1955), the Court interpreted the statute to create "a prima facie presumption that the power and discretion of the Board of Zoning Appeals have been properly exercised, and it must appear . . . to the court . . . that the decision of the Board is plainly wrong before it may be disturbed by the court." *Id.* at 205. In *Board of Zoning Appeals v. Combs*, 200 Va. 471 (1959), the Court added that

> the board is presumed to be correct, and the court should not
> substitute its discretion for that of the board. The court may not
> disturb the board's decision unless it has applied erroneous
> principles of law or where the board's discretion is involved unless
> the evidence before the court proves to its satisfaction that the
> board's decision is plainly wrong and violative of the purpose and
> intent of the zoning ordinance.

*Id.* at 477 (citation omitted). The Court repeated that deferential standard in many cases for decades.[13]

---

[13] *See Azalea Corp. v. Richmond*, 201 Va. 636, 640-41 (1960); *Bd. of Zoning Appeals v. Fowler*, 201 Va. 942, 948 (1960); *C & C, Inc. v. Semple*, 207 Va. 438, 441 (1966); *Tidewater Utils. Corp. v. Norfolk*, 208 Va. 705, 711 (1968); *Alleghany Enters. v. Covington*, 217 Va. 64, 67 (1976); *Packer v. Hornsby*, 221 Va. 117, 120 (1980); *Prince William Cnty. Bd. of Zoning Appeals v. Bond*, 225 Va. 177, 179-80 (1983); *Bd. of Zoning Appeals v. O'Malley*, 229 Va. 605, 608 (1985); *Natrella v. Bd. of Zoning Appeals*, 231 Va. 451, 456 (1986); *Nat'l Mem'l Park, Inc. v. Bd. of Zoning Appeals*, 232 Va. 89, 92 (1986); *Masterson v. Bd. of Zoning Appeals*, 233 Va. 37, 44 (1987); *Ashland v. Ashland Inv. Co.*, 235 Va. 150, 155 (1988); *Bd. of Zoning Appeals v. Glasser Bros. Corp.*, 242 Va. 197, 200 (1991); *Cook v. Bd. of Zoning Appeals*, 244 Va. 107, 111 (1992); *Riles v. Bd. of Zoning Appeals*, 246 Va. 48, 50-51 (1993); *Bd. of Zoning Appeals v. Univ. Square Assocs.*, 246 Va. 290, 295 (1993); *Steele v. Fluvanna Cnty. Bd. of Zoning Appeals*, 246

In 2003, however, the General Assembly amended Code § 15.2-2314 to distinguish for the first time between (i) the interpretation of a zoning ordinance or State law and (ii) decisions involving variances and special exceptions. 2003 Va. Acts ch. 568.[14] In *Lamar Co. v. Board of Zoning Appeals*, 270 Va. 540 (2005), the first case to address the 2003 amendment, the Court held that the amendment changed the standard of review only for reviewing the factual determinations by a board of zoning appeals. *Id.* at 545-47. "Nothing in the amendments . . . eliminate[d] the long-standing desire for consistent interpretation of zoning ordinances, an objective best accomplished by those charged with enforcing such ordinances. 'A consistent

Va. 502, 506 (1993); *Foster v. Geller*, 248 Va. 563, 566 (1994); *Donovan v. Bd. of Zoning Appeals*, 251 Va. 271, 274 (1996); *Spence v. Bd. of Zoning Appeals*, 255 Va. 116, 119 (1998); *Bd. of Zoning Appeals v. Kahhal*, 255 Va. 476, 481 (1998); *Bd. of Zoning Appeals v. 852 L.L.C.*, 257 Va. 485, 489 (1999); *Higgs v. Kirkbride*, 258 Va. 567, 573 (1999); *Wolfe v. Bd. of Zoning Appeals*, 260 Va. 7, 19 (2000); *City of Emporia Bd. of Zoning Appeals v. Mangum*, 263 Va. 38, 42 (2002); *City of Suffolk ex rel. Herbert v. Bd. of Zoning Appeals*, 266 Va. 137, 142 (2003).

[14] The 2003 amendment provided:

> In the case of an appeal from the board of zoning appeals to the circuit court of an order, requirement, decision or determination of a zoning administrator or other administrative officer in the administration or enforcement of any ordinance or provision of state law, the decision of the board of zoning appeals shall be presumed to be correct. The appealing party may rebut that presumption by proving by a preponderance of the evidence, including the record before the board of zoning appeals, that the board of zoning appeals erred in its decision. Any party may introduce evidence in the proceedings in the court.

> In the case of an appeal by a person of any decision of the board of zoning appeals that denied or granted an application for a variance, or application for a special exception, the decision of the board of zoning appeals shall be presumed to be correct. The petitioner may rebut that presumption by showing to the satisfaction of the court that the board of zoning appeals applied erroneous principles of law, or where the discretion of the board of zoning appeals is involved, the decision of the board of zoning appeals was plainly wrong and in violation of the purpose and intent of the zoning ordinance.

administrative construction of an ordinance by the officials charged with its enforcement is entitled to great weight.'" *Id.* at 547 (quoting *Masterson v. Bd. of Zoning Appeals*, 233 Va. 37, 44 (1987)). The Court added that "[d]eference to such administrative construction" furthered "uniform application and interpretation." *Id.* "Zoning administrators and boards of zoning appeals . . . develop expertise in the relationship between particular textual language and a local government's overall zoning plan." *Id.*

The Court followed that deference standard until it was superseded by the 2006 amendment to Code § 15.2-2314.[15] The 2006 amendment addressed the standard of review only for decisions by a board of zoning appeals that interpreted the zoning ordinance or State law, not decisions granting or denying a variance or special exception. 2006 Va. Acts ch. 446.[16] The

---

[15] *See Adams Outdoor Advert., L.P. v. Bd. of Zoning Appeals*, 274 Va. 189, 195 & n.3 (2006); *Christ & St. Luke's Episcopal Church*, 273 Va. at 380-82 & n.3; *Goyonaga v. Bd. of Zoning Appeals*, 275 Va. 232, 241 & n.3 (2008).

[16] The 2006 amendment provided, in relevant part:

> In the case of an appeal from the board of zoning appeals to the circuit court of an order, requirement, decision or determination of a zoning administrator or other administrative officer in the administration or enforcement of any ordinance or provision of state law, or any modification of zoning requirements pursuant to § 15.2-2286, the ~~decision~~ *findings and conclusions* of the board of zoning appeals *on questions of fact* shall be presumed to be correct. The appealing party may rebut that presumption by proving by a preponderance of the evidence, including the record before the board of zoning appeals, that the board of zoning appeals erred in its decision. Any party may introduce evidence in the proceedings in the court. *The court shall hear any arguments on questions of law de novo*.
>
> In the case of an appeal by a person of any decision of the board of zoning appeals that denied or **granted** an application for a variance, or application for a special exception, the decision of the board of zoning appeals shall be presumed to be correct. The petitioner may rebut that presumption by showing to the satisfaction of the court that the board of zoning appeals applied erroneous principles of law, or where the discretion of the board of zoning appeals is

reference to reviewing a board's "decision" was replaced with reviewing its "findings and conclusions." *Id.* The review standard remained unchanged for the board's factual determinations: its "findings and conclusions . . . *on questions of fact* shall be presumed to be correct. The appealing party may rebut that presumption by proving by a preponderance of the evidence . . . that the board of zoning appeals erred in its decision." *Id.* But conclusions of law were different: "*The court shall hear any arguments on questions of law de novo*." *Id.* Notably, the 2006 amendment did not affect the deferential standard for reviewing a board's decision granting or refusing a variance or special exception. *Id.*; *see* note 16 *supra*.

Since the 2006 amendment took effect, *every* Supreme Court case has applied de novo review under Code § 15.2-2314 when reviewing the interpretation of a zoning ordinance by a board of zoning appeals, without giving any deference or weight to the board's interpretation.[17] As the Court found in *Hale v. Board of Zoning Appeals*, 277 Va. 250 (2009), the 2006 amendment changed the standard of review for BZA interpretations of a zoning ordinance; a lower tribunal's ruling "is *no longer* presumed to be correct on appeal and 'its conclusions of law are reviewed de novo.'" 277 Va. at 268 (emphasis added) (quoting *Lovelace v. Orange Cnty. Bd. of Zoning Appeals*, 276 Va. 155, 158 (2008)); *Archie*, 296 Va. at 9 (same).

The cases listed in notes 13 and 15 *supra*—decided before the 2006 amendment took effect—have been superseded by the General Assembly to the extent they call for deferring or giving weight to the interpretation of a zoning ordinance by a board of zoning appeals. What is

---

involved, the decision of the board of zoning appeals was plainly wrong and in violation of the purpose and intent of the zoning ordinance.

[17] *See Lovelace v. Orange Cnty. Bd. of Zoning Appeals*, 276 Va. 155, 158 (2008); *Bd. of Supervisors v. Town of Purcellville*, 276 Va. 419, 438-39 (2008); *Hale v. Bd. of Zoning Appeals*, 277 Va. 250, 268 (2009); *W&W P'Ship*, 279 Va. at 486-87; *Shilling v. Baker*, 279 Va. 720, 724-25 (2010); *Archie*, 296 Va. at 9.

more, the General Assembly amended Code § 15.2-2314 (again) in 2015, this time to provide

different standards of review for appeals from decisions granting or denying a special exception

from those involving a variance. *See* 2015 Va. Acts ch. 597.[18] A "decision" by a board of

zoning appeals on a variance is now presumed correct, and that presumption may be rebutted by

"a preponderance of evidence." *Id.* A "decision" that denied or granted a special exception is

also presumed correct but may be rebutted if the court finds that the BZA "applied erroneous

principles of law, or where the discretion of the board of zoning appeals is involved, the decision

of the board of zoning appeals was plainly wrong, was in violation of the purpose and intent of

the zoning ordinance, and is not fairly debatable." *Id.*

In summary, the standard of review for decisions by a board of zoning appeals has

evolved over the past 70 years. The Supreme Court at one time applied a deferential "common

---

[18] The 2015 amendment provided, in pertinent part:

> In the case of an appeal by a person of any decision of the board of zoning appeals that denied or granted an application for a variance, ~~or application for a special exception,~~ the decision of the board of zoning appeals shall be presumed to be correct. The petitioner may rebut that presumption by ~~showing to the satisfaction of the court that the board of zoning appeals applied erroneous principles of law, or where the discretion of the board of zoning appeals is involved, the decision of the board of zoning appeals was plainly wrong and in violation of the purpose and intent of the zoning ordinance~~ *proving by a preponderance of the evidence, including the record before the board of zoning appeals, that the board of zoning appeals erred in its decision.*
>
> *In the case of an appeal by a person of any decision of the board of zoning appeals that denied or granted application for a special exception, the decision of the board of zoning appeals shall be presumed to be correct. The petitioner may rebut that presumption by showing to the satisfaction of the court that the board of zoning appeals applied erroneous principles of law, or where the discretion of the board of zoning appeals is involved, the decision of the board of zoning appeals was plainly wrong, was in violation of the purpose and intent of the zoning ordinance, and is not fairly debatable.*

- 27 -

law standard of review," *Lamar*, 270 Va. at 545, that was the same for ordinance interpretations as for decisions granting or denying a variance or special exception. But the 2003, 2006, and 2015 amendments to Code § 15.2-2314 show that the General Assembly has incrementally modified the review standard, carefully calibrating it according to the type of decision involved. The 2006 amendment makes clear that courts should no longer give deference or weight to a board's legal interpretations of a zoning ordinance. By contrast, the General Assembly has retained a deferential standard of review for decisions granting or denying a variance or special exception. But even there, the 2015 amendment created a different standard for reviewing variance decisions from the standard for decisions granting or denying special exceptions.

We will not undo the General Assembly's work by reimposing the common-law standard. For the zoning-ordinance interpretation at issue here, the 2006 amendment and the Supreme Court's consistent decisions applying it show that the BZA's conclusions of law are reviewed de novo. The circuit court thus correctly found that the BZA's interpretation of the zMod ordinance was entitled to neither deference nor great weight.

### D. *The circuit court correctly dismissed Washington Gas's declaratory-judgment action as moot.*

Finally, the circuit court properly dismissed Washington Gas's declaratory-judgment action as moot. The opening paragraph of the company's second amended complaint asked the court to "declar[e] that the Fairfax County Zoning Ordinance . . . is invalid *as construed by the [BZA].*" The prayer for relief asked the circuit court to vacate "the BZA's decision" on the ground that the zMod ordinance, "as applied to Phase 6," was barred by the Dillon Rule and by various provisions of the Virginia code. By reversing the BZA's decision, however, the circuit court effectively gave Washington Gas the relief it wanted—rejecting the BZA's interpretation that would have required Washington Gas to get a special exception for Phase 6.

The circuit court was correct to proceed no further. It did not need to "reach the question of whether the County could regulate the pipeline if it wanted to." *Washington Gas*, 113 Va. Cir. at 650. Judicial power "does not authorize [Virginia's courts] to 'issue advisory opinions on moot questions[.]'" *Berry v. Bd. of Supervisors*, 302 Va. 114, 129 (2023) (alterations in original) (quoting *Godlove v. Rothstein*, 300 Va. 437, 439 (2022)). "An action is moot 'when "the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome."'" *Id.* (quoting *Godlove*, 300 Va. at 439). "An action that involves a live controversy at its inception may become moot during . . . litigation. . . ." *Id.* Washington Gas's declaratory-judgment action "was simply another method of asking the trial court to reverse the BZA's decision." *Bd. of Zoning Appeals v. Univ. Square Assocs.*, 246 Va. 290, 294 (1993). Because Washington Gas's BZA appeal overturned the BZA's ruling, it mooted the company's declaratory-judgment action that sought the same relief on broader grounds.

Washington Gas does not persuade us that its declaratory-judgment claims are not moot because the BZA might apply its erroneous interpretation again to a future pipeline project, making the dispute "capable of repetition, yet evading review." *Commonwealth v. Browne*, 303 Va. 90, 95 (2024). For one thing, we would not expect the BZA to disregard a published ruling of this Court when considering a future appeal that involves the same type of Washington Gas project. For another, the capable-of-repetition exception to the mootness doctrine applies "only in exceptional situations." *Id.* (quoting *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)). We see no such exceptional circumstances here. Assuming without deciding that this dispute is capable of repetition as to another Washington Gas project, the company would be free to file another declaratory-judgment action challenging the BZA's authority. Such a controversy "in its duration [would not be] too short to be fully litigated prior to cessation or expiration." *Id.* (quoting *Spencer*, 523 U.S. at 17).

CONCLUSION

In sum, at least one of the landowners has standing to challenge whether Phase 6 requires a special exception under Fairfax County's zMod ordinance. The circuit court correctly found that the BZA erred in concluding that Phase 6 is a "transmission" line requiring a special exception, regardless of whether the BZA's decision is characterized as a factual determination or legal conclusion. To the extent the BZA's ruling was based on its legal construction of the zoning ordinance, the BZA's interpretation was not entitled to any deference or great weight; the 2006 amendment to Code § 15.2-2314 requires de novo review of questions of law. And the circuit court properly dismissed Washington Gas's declaratory-judgment action as moot.

*Affirmed.*